## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Subpoenas served on the Republican National Committee, the National Republican Congressional Committee, and Adam Kincaid** | No. 18-mc _____ <br><br> **Oral Argument Requested** |

### MOVANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS SERVED ON THE REPUBLICAN NATIONAL COMMITTEE, THE NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, AND ADAM KINCAID

Movants Ohio A. Philip Randolph Institute, League of Women Voters of Ohio, the Ohio State University College Democrats, Northeast Ohio Young Black Democrats, Hamilton County Young Democrats, Linda Goldenhar, Douglas Burks, Sarah Inskeep, Cynthia Libster, Kathryn Deitsch, Luann Boothe, Mark John Griffiths, Lawrence Nadler, Chitra Walker, Tristan Rader, Ria Megnin, Andrew Harris, Aaron Dagres, Elizabeth Myer, Beth Hutton, Teresa Thobaben, and Constance Rubin ("Plaintiffs") submit this brief in support of their motion to compel compliance with subpoenas served on the Republican National Committee ("RNC"), the National Republican Congressional Committee ("NRCC"), and Adam Kincaid.

### <u>INTRODUCTION</u>

Movants are Plaintiffs in *APRI v. Smith*, 18-cv-357-TSB-KNM-MHW (S.D. Ohio filed May 23, 2018). They are Democratic voters, Democratic organizations, and organizations engaged in voter access and engagement challenging Ohio's current United States congressional redistricting plan (the "plan" or "map") and each of its sixteen districts as an unconstitutional partisan gerrymander. Plaintiffs claim that the current map, which was drawn in 2011 after a coordinated strategy by state and national Republicans to win control of the state legislature for the purpose of controlling the redistricting process, intentionally burdens their: (1) First

Amendment rights to associate for the advancement of their political beliefs, to express their political views, and to participate in the political process; (2) First and Fourteenth Amendment rights to cast a meaningful vote; and (3) Fourteenth Amendment right to equal protection under the law.  Plaintiffs also claim that the 2011 map exceeds powers granted to the states under Article I of the Constitution.  Through their lawsuit, which is being litigated on an expedited basis in the United States District Court for the Southern District of Ohio, *see* Calendar Order, *APRI v. Smith*, 18-cv-357-TSB-KNM-MHW (S.D. Ohio July 17, 2017), Dkt. No. 41 (setting a trial date of March 4, 2019, and a close of discovery on December 19, 2018), Plaintiffs seek a declaration that the map is an unconstitutional partisan gerrymander and an order enjoining any further elections under the map and requiring the implementation of a new map for use in future elections.

Plaintiffs allege that national Republicans coordinated with Ohio Republicans in a campaign called the REDistricting Majority Project ("REDMAP") to win control of both houses of the Ohio legislature for the purposes of controlling the redistricting process and creating an enduring Republican majority in Ohio's congressional delegation.  Once Republicans had achieved their first goal of winning these state-level elections and controlled the levers of the map-drawing process, they then offered—in a mailing to all Republican state legislative leaders around the country—the assistance of "a team of seasoned redistricting experts that we will make available to you at no cost to your caucus for assistance."  Declaration of Theresa J. Lee in Support of Plaintiffs' Motion to Compel ("Lee Decl."), Exs. A, B, & C (the subpoenas served on the NRCC, RNC, and Mr. Kincaid) at 15.  The RNC and NRCC were among these national Republican groups involved in this process.  Lee Decl. Ex. D (Second Amended Compl., *APRI v. Smith*, 18-cv-357-TSB-KNM-MHW (S.D. Ohio July 11, 2018), Dkt. No. 37) ("Second Am.

Compl.") ¶¶ 49, 55.  Most notably, Adam Kincaid, the NRCC's Redistricting Coordinator at the time, and Tom Whatman, the Executive Director for Team Boehner, were intimately involved in drafting and approving any changes to the Ohio congressional map in 2011.  *Id*. ¶ 55.  Team Boehner "was created to work in concert with the NRCC and the RNC to expand the Republican majority in the U.S. House of Representatives."  *Id.*

To obtain documents supporting those allegations, Plaintiffs duly served the NRCC, RNC, and Adam Kincaid with tailored Rule 45 subpoenas seeking documents concerning the Ohio redistricting process.  Communications and documents in the possession of the NRCC, RNC, and Mr. Kincaid are likely to be highly relevant evidence of national and state Republicans' intent to create a map that intentionally discriminates against Plaintiffs and deprives them of their constitutional rights.

In responding to their subpoenas, the RNC, NRCC, and Mr. Kincaid submitted affidavits, and the RNC submitted a log, claiming that documents should be withheld on the basis of the First Amendment Privilege.[1]  However, they fail to establish a prima facie case of First Amendment infringement because the presence of a protective order resolves all of their concerns.  They also do not—and cannot—show that the supposed burden on their First Amendment rights outweighs Plaintiffs' significant interest in disclosure, as these documents are highly relevant to this litigation, they are necessary to prove partisan intent, and they cannot be obtained from any other source.

---

[1] Counsel for Plaintiffs discussed this motion with counsel for Respondents, as part of a series of meet-and-confer telephone conversations in the hope of resolving the issues now before the Court.  Plaintiffs agreed not to seek certain documents identified by Respondents, but no further agreement could be reached.  Respondents intend to oppose this motion.  Lee Decl. ¶ 20.

Similarly, the RNC's assertion of the attorney-client and work product privileges cannot stand, as a quick look at the log reveals communications between the RNC on one side, and Ohio Republicans and attorneys who do not represent the RNC on the other.  Such documents were not prepared in anticipation of litigation, and, even if they were, they are highly relevant to this litigation and should be produced.

While Respondents may prefer to not produce documents indicative of their intent to aid Ohio Republicans in partisan gerrymandering, that is the nature of this litigation.  This is a case about the redistricting process in Ohio, and intent is a key element of this matter.  Moreover, any concern that the documents and information will be used for political purposes is negated by a protective order that has been entered in this case.  Lee Decl. Ex. E (Stipulation and Protective Order, *APRI v. Smith*, 18-cv-357-TSB-KNM-MHW (S.D. Ohio Aug. 9, 2018), Dkt. No. 57) ("Protective Order").  The documents will be used solely for the purposes of this litigation.

## I.    Background

### A.    Redistricting Litigation in the Southern District of Ohio

Under Ohio law, the Ohio General Assembly, with the advice and assistance of the bipartisan Legislative Task Force on Redistricting, is responsible for crafting and adopting Ohio's congressional map.  Ohio General Rev. Code § 3521.01.  Plaintiffs allege that Ohio's 2011 congressional map was instead created by a team of state and national Republican operatives in secret.  Second Am. Compl. ¶¶ 3, 44-69.  The RNC, NRCC, and Mr. Kincaid were central participants in that effort.

### B.    Project REDMAP

Plaintiffs allege that in anticipation of the 2010 Census and the ensuing redistricting cycle, the Republican State Leadership Committee ("RSLC") "formulated a strategy to solidify and increase Republican control of state legislatures in states where the congressional

redistricting process would be controlled by those legislative bodies." *Id.* ¶ 44.  To implement

this strategy, the RSLC—in coordination with the State Government Leadership Foundation

("SGLF")—organized the REDistricting Majority Project ("REDMAP"). *Id.* ¶ 45.  The purpose

of the project according to REDMAP documents was "straightforward": "[c]ontrolling the

redistricting process in these states [to] have the greatest impact on determining how both state

legislative and congressional district boundaries would be drawn" and thereby "maintain a

Republican stronghold in the U.S. House of Representatives for the next decade." *Id.*.  After

Project REDMAP succeeded in its first goal of electing a Republican majority in both houses of

the Ohio General Assembly in November 2010, Chris Jankowski, the President and Chief

Executive Officer of the RSLC, sent Republican legislative leaders around the

country—including Ohio—a letter offering "a team of seasoned redistricting experts that we will

make available to you at no cost to your caucus for assistance."  Lee Decl. Ex. A, B, & C at 15.

### C.    Respondents' Role in the Redistricting of the Ohio Congressional Map

The RNC and NRCC worked in conjunction with the RSLC, SGLF, and Ohio

Republicans in 2011 to draw the Ohio congressional map in a manner that would create a lasting

partisan advantage.  Dalton Oldham, in his affidavit in support of the RNC's assertion of the

First Amendment privilege, has said that the "RNC and RSLC have a special relationship,

especially when it comes to redistricting," and that often individuals are paid by both entities for

redistricting work.  Lee Decl. Ex. F ("Oldham Aff.") ¶ 6.  This redistricting work included

efforts in Ohio.  *See id.* ¶ 7(g) (noting that the RNC is in possession of "[i]nternal

communications containing the Ohio congressional district maps"); *id.* ¶ 7(c) (noting that the

RNC was in possession of "[i]nternal communications concerning draft talking points regarding

redistricting updates . . . [s]pecific to Ohio"); Lee Decl. Ex. G ("RNC privilege log") at

REV_00023184 (reflecting "Communication between Ohio Legiislative [sic] Counsel [Mark Braden] to RNC redistricting coordinator [Tom Hofeller] for redistricting legal analysis with attachments"). Many of these communications and shared attachments regarding redistricting were with Republicans *not* affiliated with the RNC. *See, e.g.*, RNC privilege log at REV_00023184; *id.* at REV_0023205 (e-mail between Tom Hofeller and Michael Lenzo, the House Majority Counsel in Ohio).[2]

There was also a direct linkage between the Ohio redistricting process and the NRCC.[3] The NRCC, in its affidavit, asserts that "the people who worked for Team Boehner entities also worked on the Speaker's behalf at the NRCC" in their affidavit in support of the assertion of a First Amendment privilege. Lee Decl. Ex. I ("Winkelman Aff.") ¶ 8. Tom Whatman, the Executive Director of John Boehner's political operation, Team Boehner, is alleged to have played a significant role in making and approving any proposed changes to the Ohio congressional map. Second Am. Compl. ¶¶ 55-56. Mr. Whatman communicated frequently with the Ohio map drawers regarding changes to the Ohio congressional maps. Lee Decl. Ex. J (email between Ohio Republicans confirming that "Whatman signed off" on a last-minute change to the Ohio congressional map); Lee Decl. Ex. K (email from Ohio Senate President Tom Niehaus to Whatman saying that he is "committed to ending up with a map that Speaker Boehner fully supports" even if members of the leadership of the Ohio party are in dissent). Mr.

---

[2] Mr. Lenzo is listed on the privilege log as being a member of the "Ohio republican party staff." Mr. Lenzo is Chief Legal Counsel for the Majority Caucus of the Ohio House of Representatives. *See* Lee Decl. Ex. H (letter from Mike Lenzo with the title "House Republican Legal Counsel" in the signature block).

[3] Plaintiffs also note that the NRCC's membership includes "all Republican House Members." Winkelman Aff. ¶ 6. Ohio Republican members of the United States House of Representatives have intervened in this case. Order Granting Mot. to Intervene, *APRI v. Smith*, 18-cv-357-TSB-KNM-MHW (S.D. Ohio Aug. 16, 2018), Dkt. No 64.

Whatman's role was so crucial that he was even invited to Governor John Kasich's bill-signing ceremony.  Lee Decl. Ex. L.

Mr. Whatman was not the only person affiliated with the NRCC who played a significant role in the redistricting of the Ohio congressional map.  Adam Kincaid was the Redistricting Coordinator for the NRCC, which involved "conduct[ing], among other things, analyses of draft redistricting maps and final redistricting maps."  Lee Decl. Ex. M ("Kincaid Aff.") ¶ 13.  Mr. Kincaid was specifically engaged in the redistricting of the Ohio congressional maps in 2010 and 2011.  Second Am. Compl. ¶ 55.  He drew several iterations of the map and worked closely with the two Ohio Republican operatives, Heather Mann and Ray DiRossi, who the state legislature engaged to draw the congressional map.  Lee Decl. Ex. N (Kincaid sending changes to the map to DiRossi, Mann, and Whatman); Lee Decl. Ex. O (Whatman asking for a change to the map and Kincaid making the change).  Throughout this process, Mr. Kincaid used his NRCC email address, and he also frequently communicated with non-NRCC Republicans in Ohio regarding the Ohio redistricting process.  *See* Lee Decl. Exs. N & O.

### D.    Mark Braden's Role

Mark Braden was another Republican closely involved with redistricting in Ohio, and he was retained by the Ohio General Assembly.  Mr. Braden retained John Morgan, a national Republican operative and the author of RNC redistricting training materials, to assist Mr. DiRossi and Ms. Mann in the technical aspects of the map-drawing process, and Morgan's invoices were submitted to Mr. Braden's law firm.  Lee Decl. Ex. P.  While Mr. Braden was purportedly hired by the Ohio Legislature to provide legal advice during the redistricting process, his activity during the process indicates he provided political – not legal – advice.  He attended meetings regarding redistricting with the offices of Governor John Kasich, Auditor David Yost, and Secretary of State Jon Husted – none of whom were members of the legislature.  Lee Decl.

Exs. Q & R.  Mr. Braden also personally reviewed draft congressional maps circulated by,

among others, Mr. Whatman, Mr. Kincaid, Ms. Mann and Mr. DiRossi, Lee Decl. Exs. N & S,

and he is listed as the author of a draft congressional map that was analyzed for likely partisan

outcome.  Lee Decl. Ex. T. (second to last column from the right).

      Mr. Braden clearly provided non-legal, political advice to Ohio Republicans, and made

presentations to Ohio Republicans who were not his client.  *See* Lee Decl. Exs. N, Q, R, S, & T.

Moreover, his client, as noted on the RNC Privilege Log, was the Ohio Legislative Caucus.  *See,*

*e.g.*, RNC privilege log at REV_00023176 and REV_00023195.  His client was not the RNC or

other national Republicans.

## ARGUMENT

I.      **The First Amendment Associational Privilege Does Not Apply to The Documents Withheld by the RNC, NRCC, and Adam Kincaid.**

      "The First Amendment privilege . . . is not absolute.  The courts have an interest in

uncovering the truth and providing a resolution to the parties."  *Dunnet Bay Const. Co. v.*

*Hannig*, No. 10-CV-3051, 2011 WL 5417123, at *4 (C.D. Ill. Nov. 9, 2011) (citing *Deitchman v.*

*E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 561 (7th Cir. 1984)); *see also Black Panther Party v.*

*Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981), *cert. granted, judgment vacated* by 458 U.S. 1118

(1982).[4]

      To determine if a First Amendment privilege exists, courts apply a two-pronged

balancing test.  First, the party seeking to assert the privilege "must demonstrate . . . a 'prima

---

[4] "Even though the Black Panther decision was later vacated as moot, there is no suggestion in later case law in this Circuit that its reasoning or analysis has been rejected or abandoned by our Court of Appeals.  Indeed, it has been cited subsequently by the Circuit in a unanimous per curiam opinion in *Steffan v. Cheney*, 920 F.2d 74 (1990), as well as in many other cases from outside this Circuit." *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 n.6 (D.D.C. 2002) (internal citations omitted).

facie showing of arguable first amendment infringement.'" *Perry v. Schwarzenegger*, 591 F.3d

1147, 1160 (9th Cir. 2010) (quoting *Brock v. Local 375, Plumbers Int'l. Union of Am.*, 860 F.2d

346, 349-50 (9th Cir. 1988)); *see also Tree of Life Christian Sch. v. City of Upper Arlington*, No.

2:11-CV-00009, 2012 WL 831918, at *3 (S.D. Ohio Mar. 12, 2012); *Ohio Org. Collaborative v.

Husted*, No. 2:15-CV-01802, 2015 WL 7008530, at *3 (S.D. Ohio Nov. 12, 2015).  To establish

this prima facie showing, the party asserting the privilege bears the burden of showing that

compliance with the discovery requests will result in "(1) harassment, membership withdrawal,

or discouragement of new members, or (2) other consequences which objectively suggest an

impact on, or chilling of the members' associational rights." *Perry*, 591 F.3d at 1160 (internal

quotations and marks omitted); *see also Black Panther*, 661 F.2d at 1268 (party asserting

privilege must show "there is some probability that disclosure will lead to reprisal or

harassment").  Essentially, Respondents must show "exposure of that association will make it

less likely that association will occur in the future, or when exposure will make it more difficult

for members of an association to foster their beliefs." *In re Motor Fuel Temperature Sales

Practice Litig.*, 641 F.3d 470, 489 (10th Cir. 2011).

     If Respondents can clear this hurdle, the burden will shift to Plaintiffs to "demonstrate

that the information sought through the [discovery] is rationally related to a compelling . . .

interest . . . [and] the least restrictive means of obtaining the desired information." *Perry*, 591

F.3d at 1161 (internal quotations omitted); *see also Black Panther Party*, 661 F.2d at 1266

("[T]he plaintiff's First Amendment claim should be measured against the defendant's need for

the information sought.").  This ensures that any First Amendment privilege is not absolute, and

it may be overcome by a showing of need.  *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir.

2003) ("[C]ourts therefore balance the burdens imposed on individuals and associations against

the significance of the . . . interest in disclosure and consider the degree to which the [requesting party] has tailored the disclosure requirement to serve its interests."); *cf. Black Panther Party*, 661 F.2d at 1266 ("If the former outweighs the latter, then the claim of privilege should be upheld.").

Courts look to several factors to balance the parties' countervailing interests, "including (1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Ohio Org. Collaborative*, 2015 WL 7008530, at *3 (internal citations omitted); *see also Perry*, 591 F.3d at 1161.

Here, Respondents have failed to establish a prima facie showing of any First Amendment harm, as the presence of a protective order to protect against improper use or distribution of Respondents' documents alleviates any concern that the information will be used for any purpose other than pursuing this litigation.  Even if Respondents have carried their burden of establishing a prima facie showing, Plaintiffs have sufficient need for this highly relevant information such that Respondents' prima facie showing is overcome.

### A.    Prima Facie Showing

While Respondents argue that disclosure of the information sought by the subpoenas would "drastically and adversely [a]ffect" how they would "communicate[] internally in the future" and "deter full and honest discussion" about redistricting, Winkelman Aff. ¶¶13-14; Kincaid Aff.¶¶ 18-19, Oldham Aff.¶¶ 10-11, such blanket assertions are not enough to make the *prima facie* showing required because Respondents have not established either "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of the members' associational rights" *as a result of compliance with Plaintiffs' discovery requests*.  *Perry*, 591 F.3d at 1160 (internal quotation

marks omitted); *see also Black Panther*, 661 F.2d at 1268 (considering whether disclosure will lead to "reprisal or harassment"); *AFL-CIO*, 333 F.3d at 176 (finding the group should demonstrate that there is a "risk of retaliation and harassment").

Here, Plaintiffs do not dispute that Respondents are engaged in political speech, and that such speech is protected by the First Amendment.  Yet they have not established a *burden* on this First Amendment right resulting from compliance with the subpoenas.  *See AFL-CIO*, 333 F.3d at 175-76.

Respondents attempt to satisfy their burden by arguing that production of the subpoenaed documents will "permit the Plaintiffs to obtain internal and confidential communications concerning the development of strategy," Winkelman Aff. ¶ 14, that production will "permit our political opponents to know the NRCC's strategies," *id.* ¶ 16, and counsel for Plaintiffs are frequently "adverse in litigation, in advising individuals in the future about redistricting, and campaigns against the NRCC and its members," *id.* ¶ 21.  Compelling disclosure, Respondents argue, would "deter full and honest discussions . . . about redistricting," *id.* ¶ 14, allow "political opponents to know [their] strategies," *id.* ¶ 16, and "hamper [their] ability to conduct [their] internal affairs," *id.* ¶ 14.[5]

Respondents rely on *AFL-CIO v. FEC* in support of their First Amendment argument.  In *AFL-CIO*, the union did not object to compliance with a discovery request from the FEC.  333 F.3d at 171-72.  Instead, their objection was to "public disclosure of an association's confidential internal materials" pursuant to a public records request after the government's investigation had concluded.  *Id.* at 172.  The court recognized that "compelled *public* disclosure" requires a separate justification beyond the normal First Amendment privilege analysis.  *Id.* at 176.  Unlike

---

[5] The affidavits of Dalton Oldham and Adam Kincaid make substantially identical allegations.

here, *AFL-CIO* involved the public disclosure of information that was *already produced* pursuant

to a document request. *Id.* at 171; *see also id.* at 177-78 ("[W]here, as here, the Commission

compels *public disclosure* of an association's confidential internal materials . . ." ) (emphasis

added).

Moreover, Respondents ignore the presence of a protective order in this case.  Lee Decl.

Ex. E.  Courts have acknowledged that "[a] protective order limiting the dissemination of

disclosed associational information may mitigate the chilling effect and could weigh against a

showing of infringement."  *Perry*, 591 F.3d at 1160 n.6 & 1164; *Black Panther Party*, 661 F.2d

at 1267 ("The need for First Amendment protection should be carefully scrutinized."); *see also*

*Klayman v. Judicial Watch, Inc.*, No. 06-cv-670, 2008 WL 11394177, at *4 (D.D.C. Jan. 8,

2008) (in considering assertion of First Amendment privilege, concluding if documents "are

produced in response to the subpoenas, the 'chilling effect' about which [party] is concerned will

be minimized by the protective order that is currently in effect").[6]

Here, there is a protective order in place that serves to protect Respondents' First

Amendment interests.  Lee Decl. Ex. E.  This protective order provides a system for designating

---

[6] While the court in *Perry* ultimately stated that a potential protective order was not adequate to
protect the discovery target's First Amendment interests, the protective order there was just that:
potential and hypothetical.  *Id.* at 1160.  Here, there is a concrete protective order already in
place, which the parties requested in anticipation of this very situation.  *Perry* also relied on *Dole
v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1461 (9th Cir. 1991), to
support the notion that a potential protective order would not be sufficient to prevent the chilling
of speech.  *Id.* at 1160 n.6.  Yet *Dole* actually involved an appeal by the government of an order
stating that the union's information would be produced, but, because of First Amendment
concerns, only certain persons could have access to the information, only a certain number of
copies could be made, and dissemination of the information would be limited.  950 F.2d at 1461.
In other words, the government felt that the court's restriction on its access to the disclosed
information was too onerous; the disclosing party did not argue that the limitations did not
provide enough protection.  The language cited in *Perry* referred to the Secretary of Labor's
"need to know" policy that could be rescinded at any time.  *Id.*  While this toothless policy was
no bar to a finding of a prima facie burden, the court's order limited disclosure in a way to not
burden the union's First Amendment interests.

CONFIDENTIAL INFORMATION, and limits who may see this information, *id.* ¶ 4, and how such information may be used, *id.* ¶ 3.  This protective order also applies to materials produced by third parties, *id.* ¶ 14, and there is a provision to modify the protective order if necessary, *id.* ¶ 7.  At no point has counsel for Respondents sought any modification to the protective order or explained why this protective order is insufficient to guard Respondents' confidential materials from disclosure.  Lee Decl. ¶ 21.

Respondents' concern that their documents may be subject to "forced disclosure," Kincaid Aff. ¶ 19, is a generalized concern that any organization could cite in resisting production of its documents.  The Federal Rules contemplate this possibility, and nonetheless permit liberal discovery.  *See FTC v. Sysco Corp.*, 83 F. Supp. 3d 271, 274 (D.D.C. 2015) ("The Federal Rules of Civil Procedure provide for liberal discovery. . . . 'the Rules often allow extensive intrusion into the affairs of both litigants *and third parties*.'") (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30, 34 (1984)).  When information is confidential – whether it be trade secrets, confidential business communications, or protected First Amendment speech – protective orders are routinely used to allow litigation to proceed with the facts available to the litigants, while still protecting the disclosing party's interests.  *See* Fed. R. Civ. P. 26(c)(1)(G) (allowing the court to grant a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way").

### B.      Plaintiffs' Need for These Documents Outweighs Movant's First Amendment Privilege

Even if the Court finds that Respondents have met their burden of showing that their First Amendment interests will be harmed by the protected disclosure of this information, the

Plaintiffs' need for disclosure of documents responsive to these subpoenas overcomes any First Amendment privilege.

In weighing the parties' competing interests, only after finding that the discovery requests would burden the First Amendment rights of those asserting the privilege, the Court must weigh "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Ohio Organizing Collaborative*, 2015 WL 7008530, at *3; *see also Int'l Union v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978) (test for disclosure is "1) can the information sought be discovered through alternative sources and has the party seeking disclosure made reasonable attempts to obtain the information elsewhere; and 2) does the information sought go to the heart of the lawsuit"); *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002).  These factors are similar to the factors used to establish a valid claim of legislative privilege, which was recently litigated in the ongoing redistricting case in the Eastern District of Michigan, *League of Women Voters of Michigan v. Johnson*, No. 17-14148, 2018 WL 2335805, at *4 (E.D. Mich. May 23, 2018) (listing five factors: "(1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the 'seriousness' of the litigation and the issues involved; (4) the role of government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable").

In *Perry*, the court refused to order that the documents be produced.  However, in doing so, it stated:

> We do not foreclose the possibility that some of Proponents' internal campaign communications may be discoverable.  We are not presented here with a carefully tailored request for the production of highly relevant information that is

> unavailable from other sources that do not implicate First Amendment
> associational interests.

591 F.3d at 1145 n.13. Here, Plaintiffs make the narrowly tailored request for highly relevant

information that was unavailable from other sources that was lacking in *Perry*, and Respondents'

documents are discoverable. In response to these requests, Respondents have already identified

a discrete set of documents, Winkelman Aff. ¶¶ 9; Kincaid Aff.¶¶ 14, Oldham Aff.¶ 7, RNC

privilege log, which have been limited even further by Plaintiffs' agreement not to seek a number

of documents, Lee Decl. ¶ 19 & Ex. U.

### 1.   *Relevance of the Evidence*

In considering the relevance of the information sought, courts consider whether "the

information goes to the heart of the matter" and whether a litigant has "describe[d] the

information they hope to obtain and its importance to their case with a reasonable degree of

specificity." *Black Panther Party*, 661 F.2d at 1268. Here, Plaintiffs must prove discriminatory

intent to support their First Amendment and Equal Protection claims. *See Davis v. Bandemer*,

478 U.S. 109, 127 (1986) (requiring proof of discriminatory intent in partisan gerrymandering

cases); *League of Women Voters of Mich.*, 2018 WL 2335805, at *4 ("Intent is an element of

Plaintiffs' [redistricting-related] First Amendment and Equal Protection claims."). "Determining

whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry

into such circumstantial and direct evidence of intent as may be available." *Village of Arlington

Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). Communications between the

RNC, NRCC, Mr. Kincaid, other national Republicans, and Republican leaders in Ohio, as well

as internal documents regarding the redistricting of the Ohio congressional map (including

Project REDMAP), are highly relevant evidence of national and state Republicans' intent to "to

dilute the votes of Democrats by pursuing specific voting population percentages." *League of Women Voters of Mich.*, 2018 WL 2335805, at \*4.

a)   <em>The RNC's Documents are Relevant to This Litigation</em>

The documents in the RNC's possession are highly relevant to this litigation, and this first prong weighs strongly in favor of disclosure.  Dalton Oldham, in his affidavit in support of the First Amendment privilege, concedes that the RNC is in possession of "[i]nternal communications containing the Ohio congressional district maps."  Oldham Aff. ¶ 7(g).  The description of these documents illustrates precisely why these documents are necessary for Plaintiffs to prove the intent to engage in partisan gerrymandering, as they illustrate that the RNC was closely monitoring and involved in the redistricting process in Ohio for the purpose of "assist[ing] Republicans in getting elected to the House."  Oldham Aff. ¶ 11.  These documents include, according to Respondents themselves:

(a) "Internal redistricting updates . . . on a state-by-state basis";

(b) "Internal redistricting litigation analysis . . . on a state-by-state basis";

(c) "Internal communications concerning draft talking points regarding redistricting updates";

(d) "Internal communications containing preliminary drafts of articles, memoranda, and meeting agenda concerning redistricting updates, implications, and goals," including several documents "[s]pecific to Ohio";

\*\*\*

(f) "Presentations that were used to update RNC staff about the redistricting process, its progress, and its implications and strategy for the 2012 elections," specifically "PowerPoint presentations before the Ohio map passed"; and

(g) "Internal communications containing the Ohio congressional district maps."

Oldham Decl. ¶ 7(a)-(d); (f)-(g).[7]

The First Amendment privilege was also asserted over relevant documents listed on the RNC's privilege log, as these documents show correspondence between Ohio Republicans, such as Mike Lenzo (Ohio House Chief Legal Counsel), Mark Braden (Ohio Legislative counsel), and Bob Bennett (former head of the state party at the time), and national Republicans, most notably Tom Hofeller, the RNC's redistricting expert. *See* RNC privilege log at REV_00023195 (communication between Hofeller and Braden); REV_00023202 (communication between Lenzo and Hofeller regarding redistricting); REV_00023166 (communication between Mike Wild with the RNC and Bob Bennett). Mike Lenzo appears on this privilege log fourteen times not counting attachments, while Mr. Braden appears eighteen times. While Plaintiffs do not know the contents of these documents, correspondence between national and state Republicans regarding redistricting are highly relevant to this case.

These documents illustrate that national Republicans were closely involved in and monitoring the redistricting of the Ohio congressional map. They go "to the heart," *Black Panther Party*, 661 F.2d at 1268, of the issue of intent to engage in an unconstitutional partisan gerrymander.

        b)    *The NRCC's and Adam Kincaid's Documents are Relevant to This Litigation*

The documents of the NRCC and Adam Kincaid (the Redistricting Coordinator for the NRCC) are also relevant to this litigation and should be produced. Even if Mr. Winkelman is

---

[7] Plaintiffs do not seek the categories of documents not listed in this memorandum, though such documents were identified as responsive documents in the possession of Respondents in their affidavits, as they appear to be protected by the attorney-client or attorney work product privilege. Plaintiffs informed Respondents of their limitation through the meet-and-confer process. Lee Decl. ¶ 19 & Ex. U.

correct that "to the best of [his] knowledge" (7 years later, and regarding matters 4 years before

his tenure) that the withheld documents "were never sent to any Ohio legislator or Ohio

legislative staffer," Winkelman Aff. ¶¶ 2, 11, these documents were almost certainly shared with

Mr. Whatman and Mr. Kincaid.  In addition, this information was shared with the members of

Congress from Ohio, Winkelman Aff. ¶ 6 (noting that all members of Congress are NRCC

members), who are Intervenors in this litigation.  Documents relevant to an intent to increase

their electoral chances as a result of redistricting are discoverable.

Tom Whatman, the Executive Director of John Boehner's political operation, Team

Boehner, is alleged to have played a role in making and approving any proposed changes to the

Ohio congressional map, Second Am. Compl. ¶¶ 55-56, and Team Boehner and Mr. Whatman

were directly involved in the redistricting process.  *See* Lee Decl. Exs. J-K & N.  As the NRCC

explains, "The work of people associated with 'Team Boehner' often intersected with the work

of the NRCC.  As a result, it was common that the NRCC would employ or retain the same

people who worked for Team Boehner entities because the work these individuals did was also

on behalf of the NRCC."  Winkelman Aff. ¶ 8.  The NRCC's own affidavit concedes that the

documents are relevant to Plaintiffs' claims, and it lists several documents that are directly

relevant to this litigation and contain evidence of the intent of state and national Republicans to

engage in partisan gerrymandering.  Notably, the affidavit lists:

> (a) "PowerPoint Presentations that were used to update NRCC staff, NRCC
> members, and NRCC members' staff about the redistricting process, its
> progress, and its implications and strategy for the 2012 elections," including
> presentations both before and after the Ohio map passed;
>
> ***
>
> (e) "Final Ohio Congressional District maps" . . . with analysis";
>
> ***

(g) "Internal talking points that were used to prepare members for interviews about redistricting nationwide";

(h) "Excel Spreadsheets analyzing political ramifications of the redistricting process nationwide";

(i) "Memoranda analyzing the contours and composition of Ohio Congressional Districts";

\*\*\*

(l) "State-by-State summary of redistricting nationwide and its political ramifications before passage of the Ohio congressional redistricting map;"

(m) "Excel spreadsheets analyzing the contours of enacted Ohio's Congressional Districts"; and

(n) "NRCC Executive Committee Meeting Minutes"

Winkelman Aff. ¶ 9.

Finally, Adam Kincaid's documents are essential to the underlying litigation, as he was one of the primary drawers of the Ohio congressional map.  Mr. Kincaid's role as the Redistricting Coordinator for the NRCC included "conduct[ing], among other things, analyses of draft redistricting maps and final redistricting maps."  Kincaid Aff. ¶ 13.  Mr. Kincaid was specifically engaged in the redistricting of the Ohio congressional maps in 2010 and 2011, Second Am. Compl. ¶ 55, and drew several iterations of the map himself.  *See* Lee Decl. Exs. N & O.  Mr. Kincaid's affidavit concedes that he has relevant documents in his possession, including:

(a) "Analyses of Draft Ohio Congressional Maps and The Final Ohio Congressional Map";

(b) "State-by-State summaries of the progress and analysis of the nationwide 2010 redistricting cycle";

(c) "State-by-State summaries of and analysis of the results of the nationwide 2010 redistricting cycle"; and

(d)  "NRCC Redistricting Meeting Schedules."

Kincaid Aff. ¶ 14.

Therefore, as in *League of Women Voters of Michigan*, this court should find that "the first factor weighs in favor of disclosure."  2018 WL 2335805, at *4.  These documents are not merely relevant; they are documents that show national Republicans monitoring and participating in the redistricting process in Ohio, and they are essential to this lawsuit alleging an intent to engage in an unconstitutional gerrymander.  They plainly go "to the heart of the matter." *Black Panther Party*, 661 F.2d at 1268.

       2.      *Necessity of Receiving the Information Sought and the Availability from Other Sources*

Plaintiffs need these documents in order to prove unconstitutional partisan intent.  *See supra* Section I.B.1.  While Plaintiffs have served Rule 34 discovery requests on the three Defendants and seven of the Intervenors, as well as subpoenas on 37 other persons and organizations, including Ohio legislators, Ohio staff members, the RSLC, the State Government Leadership Foundation, and other national Republicans. Lee Decl. ¶21.[8]  Additionally, prior to the filing of litigation, counsel sought relevant information by public records requests to Ohio state legislators who were in office at the time of redistricting.  Lee Decl. ¶22.  Deputy Legal Counsel to the Ohio Senate Majority Caucus indicated that the legislators and their staff did not have responsive files and that legislative files were only retained two years beyond the close of the session of the General Assembly.  Lee Decl. Ex. V.  Plaintiffs also inspected the records that remained in the custody of Plaintiff League of Women Voters of Ohio, which were obtained

---

[8] Tom Whatman was one of the individuals who received a subpoena.  He produced a total of 8 documents.  Lee Decl. ¶ 21.

through state public records requests in 2011 from various Ohio Republicans who were engaged

in drawing the Ohio congressional map. Lee Decl. ¶23. Despite these efforts, Plaintiffs have

been unable to obtain the documents identified in Respondents' affidavits and on the RNC's

privilege log. *Id.* ¶ 25. *See also Greyhound Lines, Inc. v. Int'l Amalgamated Transit Union*,

1992 U.S. Dist. LEXIS 10095, at *7-8 (D.D.C. July 9, 1992) (where movant has "engaged in

extensive discovery but was unable to learn" information has satisfied duty to "obtain the

information elsewhere"). Plaintiffs must obtain these documents directly from the RNC, NRCC,

and Adam Kincaid.

    As the Eastern District of Michigan observed in another case about partisan

gerrymandering, there is a "'practical reality that officials seldom, if ever, announce on the

record that they are pursuing a particular course of action because of their desire to discriminate'

against a particular group." *League of Women Voters of Mich.*, 2018 WL 2335805, at *4

(quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323 (E.D. Va. 2015)).

Plaintiffs have not received the documents mentioned in Respondents' affidavits or the RNC's

log from their other discovery or public records requests. Lee Decl. ¶ 25. In addition, due to the

shroud of secrecy surrounding these documents regarding redistricting – evidenced by

Respondents' attempts to prevent their disclosure and use in this litigation – such intent evidence

is not publicly available. Lee Decl. Ex. W at 2 (presentation of national Republican suggesting

that it is best practice in redistricting efforts to "Keep it secret keep it safe").

    Moreover, this information is unavailable from the Ohio legislators and staff members

themselves. For example, Mike Lenzo, Chief Legal Counsel for the Ohio House of

Representatives, is listed throughout the RNC's privilege log. *See* RNC privilege log at

REV_00023174 (communication between Tom Hofeller and Mike Lenzo regarding "meeting

and presentations in anticipation of litigation in Ohio"). Yet Lenzo did not produce or log these documents himself in response to a subpoena served upon him. Lee Decl. ¶ 25. Plaintiffs have similarly not received the RNC's or NRCC's analyses of redistricting efforts in Ohio, or any of the other communications noted on the privilege log. *Id.*

In short, Plaintiffs need these documents in order to prove their intent claims, and Respondents are the only source of these documents and information. Plaintiffs have exhausted all other potential avenues, and other sources either no longer have the information, or they never had it. Respondents, in contrast, do.

3. <em>Nature of the Information</em>

The nature of the information sought is not similar to other cases where courts have refused to order the production of documents. In those cases, courts have found the First Amendment privilege prevents disclosure when the information included: (1) campaign communications about highly contested political issues (marriage for same-sex couples), *Perry*, 591 F.3d at 1139-44; (2) membership lists, *NAACP v. Alabama*, 357 U.S. 449, 466 (1958), and *Black Panther Party*, 661 F.2d at 1264-65; and (3) public disclosure of internal materials, *AFL-CIO*, 333 F.3d at 176.

This is not a case where Respondents are participating in an "advancement of political beliefs" through an electoral campaign or protest. *Perry*, 591 F.3d at 1159. In *Perry*, the court found a First Amendment privilege where movants were seeking disclosure of internal documents and communications regarding California's Proposition 8, 591 F.3d at 1162, a citizen referendum regarding the right to marriage for same-sex couples – a very personal, highly contested issue. Here, movants are seeking information regarding partisan redistricting, which, while involving an attempt to distort electoral outcomes, does not rise to the level of First Amendment activity that was present in *Perry*. Indeed, the Supreme Court has recently said that

22

partisan gerrymandering is "incompatible with democratic principles." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 292 (2004) (plurality opinion)).  While the "claim of privilege will ordinarily grow stronger as the danger to rights of expression and association increases," *Black Panther Party*, 661 F.2d at 1267, the inverse is true as well.  *AFL-CIO*, 333 F.3d at 176 (noting the difference in "the strength of the First Amendment interests asserted").

If the Court finds that any First Amendment privilege overrides the need for the limited number of documents requested by Plaintiffs, then there will be few instances where the First Amendment privilege will not apply and political organizations will be exempt from civil discovery.

### C.     Most Documents on the RNC's Privilege Log Are Not Privileged

Respondents bear the burden of demonstrating that the attorney-client and work product privileges apply.  *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018) (attorney-client); *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 134 (D.D.C. 2012) (work product).  To meet this burden, Respondents must present "affidavits or similarly competent evidence supporting each of the essential elements necessary to sustain a claim of privilege."  *Duran v. Andrew*, No. 09-730 (HHK/AK), 2010 WL 1418344, at *2 (D.D.C. Apr. 5, 2010) (internal quotation marks omitted).  In other words, "a blanket assertion of the attorney-client [or work product] privilege will not suffice.  Rather, the proponent must conclusively prove each element of the privilege."  *Dist. Title v. Warren*, 265 F. Supp. 3d 17, 23 (D.D.C. 2017) (quoting *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)).  Moreover, the mere existence of an attorney-client relationship "does not protect any and all communications between a client and a lawyer. . . . [and the] privilege 'is narrowly construed by the D.C. Circuit

because of its adverse effects on the full disclosure of truth.'"  *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64, 70-71 (D.D.C. 2017) (quoting *United States v. Phillip Morris Inc.*, 212 F.R.D. 421, 424 (D.D.C. 2002)).

    1.  *There is No Attorney-Client Relationship on the Logged Documents*

  The attorney-client privilege only applies to communications between an attorney and that attorney's client "without the presence of strangers."  *See, e.g.*, *Alexander v. FBI*, 193 F.R.D. 1, 4 (D.D.C. 2000).  When communications involve third parties, those communications are not protected by the attorney client privilege.  *See, e.g.*, *United States v. Singhal*, 800 F. Supp. 2d 1, 7 (D.D.C. 2011) (finding emails with third party recipients not privileged).  Thus, even if a communication was once privileged, the privilege dissipates if the communication is more widely disseminated.  *United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010).  Here, the RNC's privilege log is littered with examples of communications between persons who are not RNC's attorneys and their clients.  In some instances, the attorney's clients are often not even included on these communications.  A list of examples is below:

- REV_00023174: This is a communication between Tom Hofeller, an RNC employee, and Mike Lenzo, the Chief Legal Counsel for the Ohio House of Representatives.  Mr. Lenzo's client is the Ohio House of Representatives, not the RNC or Mr. Hofeller.  Plaintiffs contest any log entry that contains Mr. Lenzo.  He is not attorney to the RNC so his presence cannot serve as the basis of the privilege, and as he is a third party to the RNC, his presence defeats any claim of attorney-client privilege.[9]

- REV_00023166: This is a communication between Mike Wild, a non-lawyer with the RNC, and Bob Bennett, an Ohio Republican.  The Ohio Republican Party is a distinct organization from the RNC.  Moreover, Mr. Bennett did not have a formal role with the state Republican Party in 2011, the year of this communication.  Plaintiffs contest any log entry containing Bob Bennett on it.

- REV_00023175: This is a communication between Kevin DeWine, the head of the Ohio Republican Party, and Tom Hofeller.  The Ohio Republican Party is a distinct

---

[9] The RNC privilege log does not include the CC: field for the logged e-mails and attachments, and so additional third parties may be included on the logged communications throughout.

organization from the RNC and the RSLC.  Moreover, Plaintiffs note that neither Mr. DeWine nor Mr. Hofeller are attorneys.  Plaintiffs contest any log entry containing Kevin DeWine.

- REV_00023176: This is a communication between Mark Braden and Tom Hofeller.  Mr. Braden is described as being the "Ohio Legislative Counsel."  He is not acting in his capacity as an attorney for the RNC in this and in all other entries containing his name on this log.  Plaintiffs contest any log entry containing Mark Braden.

Respondents have failed to meet their burden of showing that these communications are privileged, and nor can they.  These are not communications with their attorneys, free of third parties, that transmit or discuss legal advice.  These documents are not protected by attorney-client privilege and should be produced.

> 2.      *The Documents on the Log Were Not Prepared in Anticipation of Litigation*

The RNC also relies upon the work product privilege, which applies when documents were prepared "in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3); *Deloitte*, 610 F.3d at 135.  The RNC has not met its burden of showing materials on their privilege log are attorney work product.

First, almost all of the documents on the log do not reflect that they were prepared in anticipation of litigation, and thus the work product protection is invoked in name only.  *See, e.g.*, RNC privilege log at REV_00023176 ("Communication between Ohio Legiislative [sic] Counsel to RNC redistricting coordinator and counsel for redistricting legal analysis with attachments."); REV_00023205 ("Communication between RNC staff and Ohio republican party regarding legal advice for redistricting.").

Second, at the time the documents were created, there could be no realistic expectation that the RNC would be party to any litigation, as there would be no standing to name this entity as a Defendant in *any* redistricting litigation where these documents might be sought.  *Banks v.*

*Office of Senate Sergeant-At-Arms*, 228 F.R.D. 24, 26 (D.D.C. 2005) (stating that the work product only applies if "the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation" (quoting *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999))); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 ("[A]t the very least some articulable claim, likely to lead to litigation, must have arisen."). And it is not enough that the RNC was aware at the time that partisan gerrymandering claims are frequently litigated, if they would never be a party to such a claim. *See United States v. Textron Inc. and Subsidiaries*, 577 F.3d 21, 29 (1st Cir. 2009) (en banc) ("It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated."). After all, "[t]he purpose of the privilege . . . is not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself."). *Coastal States*, 617 F.2d at 864.

Here, each of the privilege log entries for which Plaintiffs still seek the corresponding documents[10] were created or distributed before the Ohio congressional maps were enacted on December 15, 2011, and many before an earlier version of the map was enacted on September 26, 2011. The sole exception to this suspicious timing is a communication between Mark Braden and Tom Hofeller "regarding WSJ article in anticipation of litigation." Ex. G at REV_00023200. Yet this document is not privileged. *FPL Grp., Inc v. I.R.S.*, 698 F. Supp. 2d 66, 92 (D.D.C. 2010) ("[I]t is not enough that these documents 'involve discussions' among

---

[10] After receiving the privilege log, Plaintiffs informed Respondents that they would not seek the documents corresponding to entries REV00023258 to REV00023565, and those numbered REV00023567 to REV00023652. Lee Decl. Ex. U. Upon discussing the matter in the meet and confer, Plaintiffs also agreed that they would not seek the document numbered REV00023566, upon Respondents' representation that it summarized the legal analysis included in the documents Plaintiffs were not seeking. Lee Decl. ¶ 20. Plaintiffs are also not seeking entries REV00023196 to REV00023199.

agency employees 'regarding' the FedEx litigation . . . rather, the documents have been prepared 'for' or 'in anticipation of' litigation.").

Despite a description of many of these documents saying that they were prepared "in anticipation of litigation," it more readily appears as though the documents were prepared to shape the construction of the map, to review the map as it was being drawn, and to discuss how to obtain a partisan advantage in Ohio's congressional delegation.  For example, REV_00023195 is a September 9, 2011, communication between Hofeller and Lenzo "in anticipation of litigation."  The email has a subject of "FW: Ohio Congressional Map as of September 9th."  As this e-mail appears to be forwarded documents of the draft congressional map, it strains credulity that the document was created in anticipation of litigation.  The burden is on the RNC to show that the work product protection actually applies here, and Plaintiffs do not believe the RNC can satisfy this burden, and certainly have not done so with their summary invocation of the privilege for every document in the privilege log.

Finally, the work product privilege can be overcome if the requesting party shows "a substantial need" for the material and an inability to procure equivalent information "without undue hardship."  Fed. R. Civ. P. 26(b)(3)(A)(ii); *Deloitte*, 610 F.3d at 135.  As discussed above, Plaintiffs have shown a substantial need for this material, and they are unable to obtain it otherwise.

## CONCLUSION

Respondents have not made the requisite showing that their documents should be shielded from disclosure on the grounds of First Amendment, attorney-client, or attorney work product privileges.  Plaintiffs have demonstrated a substantial need for the documents which go the heart of Plaintiffs' case.  For all of the reasons above, Plaintiffs respectfully request that the

Court grant their motion, and compel the RNC, NRCC, and Mr. Kincaid to produce their files within 7 days.

Plaintiffs will also be concurrently filing motions to transfer this matter to the Southern District of Ohio, and to expedite the proceedings.

Respectfully submitted,

*/s/ Dale E. Ho*
Dale E. Ho (D.C. Bar No. NY0142)
Theresa J. Lee**
Emily Zhang**
T. Alora Thomas**
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2500
dho@aclu.org
tlee@aclu.org
ezhang@aclu.org
athomas@aclu.org
***pro hac vice* application forthcoming

Dated: October 12, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, a true and correct copy of the foregoing was served by email to Shawn Sheehy, counsel for Respondents at ssheehy@hvjt.law. Mr. Sheehy has agreed to accept service by email on behalf of Respondents.

*/s/ Dale E. Ho*
Dale E. Ho
